ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 03 2007

JAMES N. HATTEN, CLERK
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JACQUELINE T. HODGES AND HRC SOLUTIONS, INC. (FORMERLY KNOWN AS MED-DATA MANAGEMENT, INC. <br><br> Plaintiff, <br><br> v. <br><br> MEDASSETS NET REVENUE SYSTEMS, LLC (AS SUCCESSOR TO PROJECT METRO) ACQUISITION, LLC) AND MEDASSETS, INC. <br><br> Defendant. | CIVIL ACTION FILE NO.: <br><br> 1 07-CV-2985-GET |

## COMPLAINT

Plaintiffs, Jacqueline T. Hodges and HRC Solutions, Inc. (formerly known as Med-Data Management, Inc.), respectfully state the following for their Complaint against MedAssets Net Revenue Systems, L.L.C. (as successor to Project Metro Acquisition, L.L.C.) and MedAssets, Inc.:

### JURISDICTION AND VENUE

1.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (diversity), because Plaintiffs are citizens of the State of Louisiana, Defendants are citizens of two different states other than Louisiana, and the amount in controversy exceeds Seventy-Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest and costs.

2.

Venue is proper in this Judicial District, because the defendant has its principal place of business in this District, the contract in question was executed in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

3.

Plaintiffs are: (1) Jacqueline T. Hodges ("Hodges"), a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana; and (2) HRC Solutions, Inc. ("HRC Solutions"), formerly known as Med-Data Management, Inc. ("Med Data"), a corporation organized and existing under the laws of the State of Louisiana, with its principal place of business in St. Tammany Parish, Louisiana. On or about October 18, 2005, Med-Data changed its name to HRC Solutions. (Except as otherwise specifically noted, HRC Solutions, is referred to herein by its former name, Med- Data).

4.

Defendant, MedAssets Net Revenue Systems, L.L.C. ("MedAssets NRS") is now, and was, at all times relevant to this action, a limited liability company, organized under the laws of Delaware, with its principal place of business in Alpharetta, Georgia.

5.

Defendant, MedAssets, Inc. ("MedAssets") is now, and was, at all times relevant to this action, a corporation organized under the laws of Delaware, with its principal place of business in Alpharetta, Georgia.

## FACTS

6.

Plaintiffs' claims in this case arise in connection with an Asset Purchase Agreement dated July 15, 2005 (the "APA") between Defendant, Project Metro Acquisition, L.L.C. ("Project Metro") as purchaser, and Med-Data, and Hodges as sellers. Pursuant to the terms of the APA, Project Metro acquired all of the assets of Med-Data. That transaction is herein referred to as the "Asset Sale."

7.

Until the time of the Asset Sale, in the summer of 2005, Med-Data operated a successful business selling healthcare reimbursement and billing software and consulting services. Med-Data sold two primary software products: (1) Medgician, its chargemaster tool, which hospitals use to manage their chargemaster (the list for each of the hospital's products and services, including charge codes and prices); and (2) Postlink ICM, a denials management program that processes payment data from Medicare, Medicaid and insurance companies and places that information into a database, so that the hospitals can better understand and manage their billings.

8.

Both before and after the transaction at issue in this case, Defendant, MedAssets NRS, sold its own chargemaster software known as BPI.

9.

Medgician and BPI frequently competed for contracts in the marketplace and both programs performed many of the same functions.

10.

Prior to the transaction at issue, MedAssets NRS did not sell a software program that provided the denials management functions of Postlink.

11.

Med-Data's products were viewed as cutting edge in the healthcare reimbursement field, and the company was generally well-respected and earned a good reputation for its innovations and high degree of technical competence. By way of example, the products formerly offered by Med-Data continue to receive better ratings on customer satisfaction surveys than products offered by Med Assets NRS.

12.

Despite its small size and sales force of two, Med-Data and its cutting-edge products won several major national contracts. At the time of the sale, Med-Data's products had recently won or were in the process of winning major contracts at Duke, L.S.U. Health Systems, Accretive Health, Catholic Health, Spectrum, St. Vincent's, and other facilities.

13.

In light of that success, Med-Data was interested in enhancing its sales force and obtaining additional capital to fund the rapid growth that it anticipated for its business.

14.

Med Assets and Med Assets NRS approached Med-Data and its owner with an offer to purchase the assets of Med-Data by a Med-Assets subsidiary called Project Metro.

15.

The final offer included a proposal to pay $2.5 million in cash and to assume certain debts and liabilities of Med-Data. MedAssets also offered additional consideration in the form of an earn-out (the "Earn-Out") to be paid based on the sales of Medgician, Postlink and certain other sales and services. Med-Data anticipated, based upon reasonable pro forma projections, that the majority of the consideration for the sale would come from the Earn-Out.

16.

The final Earn-Out formula included in the APA was based upon reasonable expectations considering Med-Data's sales trends, in terms of the number of its software licenses sold and the price per license or revenue per sale. The anticipated revenues were based almost exclusively upon the anticipated sales of Medgician and Postlink.

17.

The overall compensation for the Asset Sale, including the anticipated Earn-Out, was set at 6.6 times the pre-tax operating earnings ("adjusted EBITDA", as defined in the APA).

18.

MedAssets promised an operating environment in the nature of a collaborative partnership and specifically and repeatedly represented during the negotiation process, that MedAssets would handle the Earn-Out portion of the purchase in a manner that was fair to Med-Data and would promote, and not diminish, Med-Data's products and sales of those products.

19.

MedAssets and MedAssets NRS promised to deliver a national sales and marketing presence for the software products sold by Med-Data, including a sales force that would provide many more "feet on the street" for the marketing of Medgician and Postlink.

20.

Med-Data and Hodges also were promised greater development resources for the software products, including resources to enhance the functionality of Postlink.

**The Sale**

21.

In reliance on the promises she received, Hodges agreed to sell the assets of Med-Data based on, among other things, a formula that provided for the following consideration: (1) $2.5 million in cash (the "Initial Cash Payment"), (2) the assumption of certain debt, and (3) additional consideration ("Additional Consideration") based on the Earn-Out. The $2.5 million Initial Cash Payment plus the deferred Additional Consideration from the Earn-Out comprised the total cash purchase price ("Total Cash Purchase Price").

22.

Section 3.4 of the APA provided that Plaintiff, HRC Solutions, was to receive Additional Consideration based on the Earn-Out. The Earn-Out payment was to be 6.6 times the "Adjusted EBITDA of the Buyer for the period from July 1, 2006 through June 30, 2007" (the "Earn-Out Period"), up to a maximum of $4 million in Additional Consideration. The parties also agreed that the initial $2.5 million Initial Cash Payment would be deducted from the Additional Consideration due, such that the Total Cash Purchase Price to plaintiffs would not exceed the

lesser of 6.6 times Adjusted EBITDA or approximately $6.5 million.

23.

MedAssets NRS guaranteed the payment obligations of Project Metro.

**The Employment Contract**

24.

As part of the APA, Hodges personally agreed to enter into an employment agreement ("Employment Agreement") with MedAssets NRS.

25.

In conjunction with the Employment Agreement, Hodges also executed an Option Grant Notice with Defendant MedAssets, Inc., which provided her with performance accelerated stock options ("PASO Options").

26.

Under the Option Grant Notice and Schedule 11.6 of the APA, Hodges received 175,000 PASO Options, which were to vest at the earlier of (1) the seventh anniversary of the July 15, 2005 option grant, or, (2) June 30, 2007, assuming that performance measures were met.

27.

According to the Option Grant Notice, performance acceleration of the PASO Options was to occur according to the following formula:

> [F]or each $5.60 of Adjusted EBITDA during the period of July 1, 2006 through June 30, 2007, that number of Options shall vest as is equal to the number obtained by dividing the number of Options subject to this Agreement by the aggregate number of performance accelerated stock options granted pursuant to Section 11.6 of the Asset Purchase Agreement that are outstanding as of June 30, 2007 (any such vesting, "Accelerated Vesting").

7

28.

Under the Option Grant Notice, the PASO Options become fully vested once $980,000 in adjusted EBITDA is attained.

29.

Similarly, under the formula set forth in the APA, the Earn-Out was to reach its maximum once product and service sales reached $987,500 in adjusted EBITDA.

30.

If Defendants had fulfilled their obligations Hodges and Med-Data would have received the full $6.5 million Total Cash Purchase Price and all of the PASO Options should have vested on an accelerated basis based on performance.

### Post-Acquisition Conduct

31.

On or about September 13, 2005, Project Metro Acquisition, LLC changed its name to Med-Data Management, LLC, and or about December 31, 2005, Med-Data Management, LLC merged into MedAssets Net Revenue Systems, LLC.

32.

With regard to the calculation of the Additional Consideration due under the Earn-Out, the APA defines "Adjusted EBITDA" in relevant part as "an amount equal to (i) Buyer's earnings during such period before interest, taxes, depreciation and amortization...." The Preamble of the APA defines the Buyer as Project Metro Acquisition LLC.

33.

By effect of the merger, MedAssets NRS subsumed all of Project Metro's operations, managerial control, and accounting functions.

34.

As a result of the merger, the Buyer under the APA, Project Metro, no longer exists, and the surviving entity after the merger is MedAssets NRS.

35.

Because the Earn-Out is calculated based upon the Adjusted EBITDA of the Buyer, the Adjusted EBITDA used in the Earn-Out calculation is now based upon the earnings of MedAssets NRS, the successor-by-merger to the Buyer.

36.

Based upon the Adjusted EBITDA of MedAssets NRS, the full amount of Additional Consideration is due under the Earn-Out.

37.

As a part of the acquisition, Hodges, the owner of Med-Data, was divested of control over the marketing and development of Postlink and Medgician, and MedAssets and MedAssets NRS assumed complete responsibility for enhancing the products, servicing existing clients, performance under existing contracts, directing marketing, and generating sales that directly affected Plaintiffs' realization of the Earn-Out.

38.

Despite the agreement to compensate Plaintiffs based on an Earn-Out and the promises of enhanced marketing of their products, immediately after the acquisition, MedAssets made

repeated statements to customers and potential customers that MedAssets was "sunsetting" Med-Data's leading product, Medgician.

39.

Upon information and belief, customers were informed that, instead of continuing to support Medgician, the "look, feel and functionality" of Medgician would be subsumed into another MedAssets product, its own tool named BPI – a product that was not subject to the Earn-Out.

40.

Within two weeks of the acquisition, MedAssets willfully and intentionally breached one of Med-Data's most lucrative contracts by violating agreements concerning confidentiality and non-solicitation of the client's customers. As a result, one of the largest contracts of Med-Data eventually was cancelled.

41.

MedAssets diverted another key customer to products that were not subject to the Earn-Out. MedAssets failed to enforce the customer's contract with Med-Data, even though the customer had accepted Medgician and numerous product enhancements, placed the product in live production and acknowledged that the contract was in effect. Instead of enforcing the contract, MedAssets decided to convert the client to another product that was not subject to an Earn-Out.

42.

The primary market in which Med-Data's products were sold before the Asset Purchase was the large hospital market in which the revenue for each software sale was generally much greater than it was in the small hospital market.

43.

Plaintiff's agreement to accept payment based upon the Earn-Out was premised upon Med-Data's products continuing to be offered and sold in all markets, including the large hospital market.

44.

October 10, 2005, less than three (3) months after the acquisition, MedAssets and MedAssets NRS announced that new sales of Medgician were being relegated to the unprofitable, small hospital market, instead of the larger market where the product had competed successfully prior to the sale. The sales force of MedAssets NRS received explicit instructions to "avoid presenting both products to prospects," in the large hospital market. The marketing directive issued by the Defendants dictated that the only product to be sold in the market for large hospitals was MedAssets chargemaster product, BPI - which was not subject to the Earn-Out.

45.

Within the first three months after the acquisition, the programming staff for Medgician was diverted to other projects. Hodges objected and warned that delivery deadlines to customers would be missed for software updates. However, MedAssets insisted that the staff be diverted. Product defects and deficiencies in MedAssets' other products required MedAssets to develop a

new program, using the Medgician programmers and the "look, feel and functionality" of Medgician.

46.

The "new" product, CDM Master, was released in or around February, 2007, during the Earn-Out Period. CDM Master was not subject to the Earn-Out.

47.

After the acquisition, no significant effort was made to market Med-Data's other product, Postlink, by employees outside of the original Med-Data sales force.

48.

In or around March, 2007, the Defendants terminated four essential Postlink personnel: the Development Manager, two programmers, and one IT employee.

49.

In or around June, 2007, Med Assets NRS acquired XactiMed. XactiMed marketed a denials product, XDM, which competed with PostLink.

50.

Despite promises by MedAssets and MedAssets NRS to deliver an enhanced marketing effort for the marketing of Medgician and Postlink, the sales and support employees in the Atlanta office of MedAssets received little or no training on many fundamental aspects of the software. Moreover, the managers who had the responsibility for selling, supporting and developing the software were not conversant with the functioning of those programs, and admitted to Hodges that they would not market Medgician and Postlink, because they did not know the products.

51.

Maintaining a skilled and motivated work force for the marketing and development of Postlink and Medgician was critical to their success. Shortly after the acquisition, a written commitment was made to give a bonus to the Louisiana employees based on MedAssets NRS meeting one hundred percent (100%) of its budgeted earnings.

52.

MedAssets NRS breached its obligation to the employees of the Louisiana office by failing to pay bonus compensation, as agreed, and otherwise engaged in a course of conduct that degraded and demoralized the staff of that office.

53.

In sum, rather than a business combination whereby new sales were leveraged through a larger organization, the decisions made by MedAssets eliminated any potential for a meaningful positive impact on sales and earnings based on Med-Data's products.

54.

Hodges was routinely and systematically excluded from virtually all of the decisions Defendants made with respect to the sales, marketing, product placement, and development of Medgician and Postlink, many of which decisions adversely affected the products upon which the Earn-Out calculation was based.

55.

Defendant MedAssets made a public filing which suggested that no Additional Consideration was due under the APA. Promptly thereafter, on or about August 31, 2007,

Hodges communicated her concern and disagreement with the statement made in the public filing to Neil Hunn, an employee of MedAssets.

56.

In response, MedAssets took Hodges' office keys, computer, and company phone, and placed her on "administrative leave", excluding her from the offices of the company and thereby constructively discharging her.

57.

On or about October 26, 2007, Hodges sent a letter to MedAssets, exercising her right to terminate the Employment Agreement with "Good Reason", as defined in the Employment Agreement.

58.

MedAssets is liable to Hodges for amounts due under the Employment Agreement and for the value of PASO Options that should have vested if Defendants had fulfilled their obligations in good faith.

59.

Section 3.4(a) of the APA provides in relevant part that "[w]ithin ninety (90) days after June 30, 2007, the Buyer shall prepare and deliver to the Seller a schedule detailing the calculation of the Additional Consideration (the "Earn-Out Schedule"). Section 3.4(b) further provides that [w]ithin five (5) Business Days following the preparation or computation and final determination of the Earn-Out Schedule pursuant [sic] Section 3.4(a) hereof, the Buyer shall pay to the Seller" the Earn-Out.

60.

The Defendants sent Hodges a letter dated September 25, 2007, stating that no Additional Consideration was due under the Earn-Out.

61.

Plaintiffs provided a timely response, stating that Defendants have subverted both the Earn-Out and the contractual procedure for performing the Earn-Out calculation, such that accounting procedure under generally accepted accounting principles cannot address the basis of Plaintiffs' complaints.

## COUNT I
*Breach of Contract and Duty of Good Faith and Fair Dealing*

62.

Plaintiffs adopt and incorporate by reference all of the allegations in paragraphs 1 through 63, inclusive, as if fully set forth herein.

63.

The APA incorporates the laws of the State of Delaware, which imposes in all contracts an implied covenant of good faith and fair dealing. The duty of good faith and fair dealing is a promise of faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.

64.

The covenant of good faith includes the obligation to preserve the spirit of the bargain and the adherence to its substance.

65.

The implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

66.

Parties are liable for breaching the covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms.

67.

In the context of an Earn-Out, the duty of good faith and fair dealing imposed on MedAssets and MedAssets NRS an obligation to provide a reasonable opportunity to maximize the sales that were subject to the Earn-Out and to refrain from conduct that subverted realizing the full value of the Earn-Out.

68.

Defendant MedAssets NRS breached its duty of good faith and fair dealing and is liable to HRC Solutions for the Earn-Out and to Hodges for the value of her PASO Options that would have been realized if MedAssets NRS had fulfilled its obligations in good faith.

69.

To the extent that Hodges donated PASO options to Med-Data employees or distributed those options by way of bonus compensation, the foregoing breaches by MedAssets NRS defeated her donative intent, and MedAssets NRS is liable for the payment of the value of those options that would have been realized, but for the foregoing breaches, or, alternatively, for

damages that result from those breaches.

## Punitive Damages

70.

Upon information and belief, Defendants willfully and intentionally:

a.) Negotiated the Asset Purchase and promised the Earn-Out, when the Defendants planned to breach a key contract and "sunset" products upon which the Earn-Out depended;

b.) concealed from Plaintiffs that Defendants had informed customers that they were "sunsetting" Med-Data's products and/or converting them to other products;

c.) Converted contracts and intellectual property to products that were not subject to the Earn-Out;

d.) Restricted marketing effort, so as to defeat the Earn-Out;

e.) Performed the purported "Earn-Out' calculation in bad faith;

f.) Engaged in all of the foregoing, while making commitments to the Plaintiffs that they would be treated fairly with respect to the Earn-Out.

71.

Based on the foregoing, Defendants should be compelled to pay punitive damages.

72.

Plaintiffs pray for trial by jury.

**WHEREFORE**, Plaintiffs, Jacqueline T. Hodges and HRC Solutions, Inc. demand judgment against Defendant, MedAssets Net Revenue Systems, LLC (as successor to Project Metro, LLC) for such damages as are reasonable, including payment for compensatory damages,

statutory penalties, costs, attorney's fees, punitive damages and for such further relief as the Court deems just and proper.

*signature*

Douglas R. Kertscher, Esq.
Georgia Bar No. 416265
**Hill, Kertscher & Wharton, LLP**
3350 Riverwood Parkway
Suite 800
Atlanta, Ga. 30339
(770) 953-0995 Ext. 102
(770) 953-1358Fax

**OF COUNSEL:**

*Kirk Reasonover - by DRK w/ Express permission*

Kirk Reasonover, Of Counsel
Louisiana Bar No. 21039
**REASONOVER AND OLINDE, LLC**
400 Poydras Street, Suite 1980
New Orleans, LA 70130
Telephone: (504) 587-1440
Facsimile: (504) 587-1577
*Counsel for Plaintiffs,*
*Jacqueline T. Hodges and*
*HRC Solutions, Inc.*