IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACQUELINE T. HODGES AND
HRC SOLUTIONS, INC.
(FORMERLY KNOWN AS MED-
DATA MANAGEMENT, INC.),

          **Plaintiffs,**

   **v.**

MEDASSETS NET REVENUE
SYSTEMS, LLC (AS SUCCESSOR
TO PROJECT METRO
ACQUISITION, LLC) AND
MEDASSETS, INC.,

          **Defendants.**

**1:07-cv-2985-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendants MedAssets Net Revenue

Systems, LLC ("MedAssets NRS") and MedAssets, Inc.'s ("MedAssets")

(collectively, "Defendants") Motion to Dismiss, or, In the Alternative, Stay

Judicial Proceedings Pending Alternative Dispute Resolution. [5].

**I.**     **BACKGROUND**

On December 3, 2007, Plaintiffs Jacqueline T. Hodges ("Hodges") and HRC

Solutions, Inc. ("HRC", formerly known as "Med-Data Management, Inc." and

hereinafter referred to as "Med-Data"; and collectively "Plaintiffs") filed their

Complaint in this Court alleging breach of contract and breach of the duty of good

faith and fair dealing.  Both Plaintiffs and Defendants are in the business of selling

healthcare management software.  On July 15, 2005, Plaintiffs entered into an

Asset Purchase Agreement ("APA") with Project Metro Acquisition, L.L.C.

("Project Metro"), predecessor of MedAssets NRS.  Pursuant to the terms of the

APA, Project Metro acquired all of the assets of Med-Data.  Prior to its acquisition,

Med-Data sold two primary software products: (1) Medgician, which hospitals use

to manage their lists of chargeable products and services; and (2) Postlink ICM,

which allows hospitals to manage their denied claims data from Medicare,

Medicaid, and insurance companies.  See Complaint ¶ 7.  Both before and after the

transaction, MedAssets NRS sold a software product with functions similar to

Medgician.  MedAssets NRS did not sell programs similar to Postlink.  See Compl.

¶¶ 8-10.

Consideration for the APA consisted of: (1) $2.5 million in cash; (2)

assumption of certain of Med-Data's debts and liabilities; and (3) options payable

to Hodges (as owner of Med-Data) and an earn-out based on sales by Project Metro

of Medgician, Postlink, and other sales and services (the "Earn-Out").  See Compl.

¶ 15; Motion to Dismiss, p 4-5.  The Earn-Out payment was to be 6.6 times the "Adjusted EBITDA[1] of the Buyer for the period from July 1, 2006 through June 30, 2007" (the "Earn-Out Period"), up to a maximum additional consideration of $4 million.  Compl. ¶ 22.

In connection with the acquisition, Hodges entered into an employment agreement ("Employment Agreement") with MedAssets NRS.  As part of the Employment Agreement, Hodges executed an Option Grant Notice with MedAssets, Inc., which provided her with performance accelerated stock options ("PASO Options").  Pursuant to the Option Grant Notice and the APA, Hodges received 175,000 PASO Options, which were to vest at the earlier of (1) the seventh anniversary of the July 15, 2005 option grant, or (2) June 30, 2007, if certain performance measures were met.  Under the Option Grant Notice, the PASO Options became fully vested once Adjusted EBITDA reached $980,000. See Compl. ¶¶ 24-26, 28; Motion to Dismiss, p 6.

---

[1] EBITDA is defined in the APA as MedAssets NRS' earnings before interest, taxes, depreciation and amortization.

The Earn-Out terms required Defendants to deliver an Earn-Out Schedule to Hodges within 90 days after June 30, 2007[2], which detailed any additional consideration due to Hodges.  Hodges had 60 days to object to the schedule by submitting a Seller's Report.  If a Seller's Report was not submitted, the Earn-Out Schedule was deemed accepted by Hodges.  If Hodges objected, Defendants had 30 days to respond to the Seller's Report.  If no response was made, the Seller's Report was deemed accepted.  See Motion to Dismiss, p 5.  Embedded in the Earn-Out provision is an alternative dispute resolution ("ADR") clause.  After describing the requirement of an Earn-Out schedule and the objection procedures, the section states:

> If the Buyer gives the Seller notice of the objections to the Seller's Report, and if the Buyer and Seller are unable, within fifteen (15) days after receipt by the Seller of the notice by the Buyer of objection, to resolve the disputed exceptions, such disputed exceptions will be referred to an Independent Accounting Firm within thirty (30) days thereafter.  The Independent Accounting Firm shall within sixty (60) days following its selection, deliver to the Buyer and the Seller a written report determining such disputed exceptions, and its determination will be conclusive and binding upon the parties hereto

---

[2] The specific requirement is stated in the APA as follows: "Within ninety (90) days after June 30, 2007, the Buyer shall prepare and deliver to the Seller a schedule detailing the calculation of the Additional Consideration (the 'Earn-Out Schedule')."  APA § 3.4(a).

> for the purpose of any Additional Consideration to be paid under Section 3.4(b) hereof.  To the extent appropriate, the determinations of the Independent Accounting Firm shall be made and articulated in accordance with GAAP (subject to any deviations from GAAP required by this Agreement.).

Id.

On September 25, 2007, Defendants informed Hodges that no additional consideration was due under the Earn-Out, claiming it had failed to meet the threshold Adjusted EBITDA within the Earn-Out Period.

Hodges brings this action claiming that Defendants breached their duty of good faith and fair dealing by not providing a reasonable opportunity to maximize sales of products that were subject to the Earn-Out and otherwise subverting realization of the full value of the Earn-Out and the vesting of the PASO Options. See Compl. ¶¶ 67, 68.  In the motion before the Court, Defendants allege that any claim by the Plaintiffs is subject to the Alternative Dispute Resolution clause ("Resolution Clause") in the APA, and they therefore seek dismissal of the action or, alternatively, a stay pending arbitration.   Defendants also argue, as additional grounds for dismissal, that Plaintiffs have failed to make a valid claim for breach of the duty of good faith and fair dealing or for punitive damages.  Finally, Defendants move to dismiss MedAssets, Inc. as a defendant.

## II.    DISCUSSION

### A.    Applicability of the Alternative Dispute Resolution Clause

Defendants first claim that the Court should dismiss this action because Plaintiffs' claims are subject to what it characterizes as a mandatory ADR clause in the APA.  Plaintiffs argue that their claims for breach of contract and breach of the duty of good faith and fair dealing are not subject to the Resolution Clause.

State law governs the interpretation and formation of arbitration agreements, and federal law controls their enforceability.  See Smith v. Pay-Fone Systems, Inc., 627 F. Supp. 121, 124 (N.D.Ga. 1985); St. Paul Fire & Marine Ins. Co., Inc. v. La Firenze, LLC, 2007 WL 2010759 *3 n. 3 (M.D. Fla. 2007).[3]  The Federal Arbitration Act, 9 U.S.C. § 4 (2000) ("FAA"), is based on the strong federal policy supporting arbitration agreements.  In enacting the FAA, Congress was seeking "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place [these] agreements on the same footing as other contracts."  EEOC v. Waffle House, Inc., 534 U.S. 279, 289 (2002).  The Supreme Court and this Circuit

_____

[3] The interpretation tenets apply under Delaware, which is the law the parties chose for the purposes of the APA.  The Court will analyze the enforceability of the Resolution Clause in accordance with the Federal Arbitration Act, provided the Court finds a valid contract exists under Delaware law.

consistently have required federal courts to "rigorously enforce agreements to arbitrate." Shearson/Am. Express v. McMahon, 482 U.S. 220, 226 (1987); Ivax Corp. v. B. Braun of Am., Inc., 286 F.3d 1309, 1315 (11th Cir. 2002); Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. Medpartners, Inc., 312 F.3d 1349, 1357 (11th Cir. 2002) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985)). The Court decides "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003).

To determine whether arbitration is required, "the Court must assess whether: (1) there is a valid written agreement to arbitrate; (2) the issue [sought to be arbitrated] is arbitrable under the agreement; and (3) the party asserting the claims has failed or refused to arbitrate the claims." Lomax v. Woodmen of the World Life Insurance Society, 228 F. Supp. 2d 1360, 1362 (N.D. Ga. 2002) (citations omitted). The Court first must determine if there is a valid contract under Delaware law.

Under Delaware law, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a

consideration."  <u>Wood v. State</u>, 815 A.2d 350 (Del. 2003) (citing Restatement

(Second) of Contracts § 18 (1981)).[4]  It is undisputed that Hodges and MedAssets

NRS agreed to the terms of the APA, which included an Earn-Out section

containing the Resolution Clause.  The question for the Court is whether the

Resolution Clause constitutes an arbitration clause under the FAA, and if so, what

is the scope of the arbitration provision.

While the Resolution Clause in the APA does not specifically refer to

arbitration, that fact alone does not defeat a claim that the clause requires

arbitration.  <u>See</u> <u>Fit Tech, Inc. v. Bally Total Fitness Holding Corp.</u>, 374 F.3d 1, 7

(1st Cir. 2004).  Rather, the Court must determine whether referral to an

Independent Accounting Firm for purposes of resolving Earn-Out issues

constitutes "arbitration" under the FAA.  The FAA does not define "arbitration", so

the question is "how closely the specified procedure resembles classic arbitration

and whether treating the procedure as arbitration serves the intuited purposes of

Congress."  <u>Fit Tech</u>, 374 F.3d at 7.

---

[4] The decision of the Delaware Supreme Court is referenced in the Atlantic
Reporter in a "Table of Decisions Without Published Opinions."

The American Arbitration Association ("AAA") defines arbitration as the submission of a dispute to one or more impartial persons for a final and binding decision.  See AAA Online Library, http://www.adr.org/online_library.  The AAA notes that arbitrators are chosen for their knowledge and experience and are both attorneys and non-attorneys alike.  Id.  While there is no Eleventh Circuit opinion on point[5], case law from the First Circuit supports Defendants' argument that submission to an independent accountant may constitute *de facto* arbitration.  See Fit Tech, 374 F.3d at 7 (submission of a dispute to Price Waterhouse was arbitration in everything but name as characteristics of arbitration such as an independent adjudicator, substantive standards, and an opportunity for each side to present its case were present).  See also, Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 8 n.4 (1st Cir. 1999) (recognizing that arbitration allows parties to select arbitrators with expertise in the subject matter of the dispute); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 679 (7th Cir.), cert. denied, 464 U.S. 1009 (1983) (same).

---

[5] Neither the parties nor the Court has found any Eleventh Circuit case that directly addresses this issue.

The Resolution Clause in the APA requires "any dispute" with respect to the Earn-Out Determination to be submitted to an Independent Accounting Firm, noting further that the decisions of the accounting firm "shall be made and articulated in accordance with GAAP [Generally Accepted Accounting Principles]. . . ." Section 3.4(a) of the APA.  The Buyer (Defendants) and Seller (Plaintiffs) are each entitled to present their respective cases to the accounting professionals whose duty then is to adjudicate independently, using GAAP standards, the differences between the parties regarding the schedules used to calculate any Earn-Out under the agreement.  The Court concludes that the Resolution Clause is a valid form of final and binding arbitration for purposes of the FAA.

The parties do not contest that the Resolution Clause provides a resolution process for certain disputes.  The question is whether the Resolution Clause governs Plaintiffs' claim alleged in this action, or does it apply to something less. Plaintiffs contend that Defendants denied Plaintiffs a reasonable opportunity to maximize sales of products that were subject to the Earn-Out by engaging in conduct that allegedly subverted realization of the full value of the Earn-Out. Plaintiffs argue that the Resolution Clause applies, if at all, only "to resolve disputes regarding whether the 'calculation' of the earn-out was done according to

-10-

'generally accepted accounting principals [sic] (GAAP).'"  Memorandum in Opposition to Defendant's Motion to Dismiss, p 17.  The Court agrees the dispute resolution process is limited to the resolution of objections to the calculations on the schedules prepared and upon which additional compensation, if any, was determined.

Under Delaware law, contracts are to be "construed as a whole, to give effect to the intentions of the parties.  If the contract language is clear and unambiguous, then the parties' intent is ascertained by a reasonable reading of the plain language of the policy." Sussex Equipment Co. v. Burke Equipment Co., 860 A.2d 812 *1 (Table) (Del. 2004) (internal citations omitted).  In the Court's view, the Resolution Clause in the APA requiring "any dispute" to be submitted to an Independent Accounting Firm was intended by the parties only to encompass any dispute regarding the calculation of any additional consideration as determined by the Earn-Out.  In fact, reading Section 3.4 as a coherent whole, it is evident this section applies to disputes concerning the calculation of sales–not whether the effort to generate them was insufficient to constitute the violation of an express or implied duty based on or arising from a contract.  The first sentence of Section 3.4 is telling:

> Within ninety (90) days after June 30, 2007, the Buyer shall
> prepare and deliver to the Seller a *schedule* detailing the
> *calculation* of the Additional Consideration
> (the "Earn-Out Schedule").

APA § 3.4(a) (emphasis added).  This reference in the opening words of the section

describes an accounting process involving detailed information schedules prepared

for use in calculating the additional consideration to be paid.  The First Circuit's

decision in <u>Fit Tech</u> is instructive because it considers facts strikingly similar to

those here.  In <u>Fit Tech</u>, the court considered the application of a dispute resolution

procedure that applied to this calculation of additional consideration based on

EBITDA.  In that case, defendant Bally Total Fitness purchased and acquired eight

health and fitness centers owned by the plaintiffs.  The purchase agreement fixed

the purchase price at $14.7 million due at closing but included a provision in which

the total amount of consideration could be increased by a maximum of $12 million

depending on the earnings of the eight centers in the two years following the

closing.  Any extra consideration was computed based on EBITDA.  Bally was

required to provide to plaintiffs quarterly reports of the EBITDA as well as a final

determination of earn-out after the two years.  Plaintiffs had 60 days to object to

any calculation.  Any dispute regarding the earn-out was to be referred to

accountants for final determination.  Plaintiffs alleged that Bally's had engaged in

operational misconduct by manipulating their phone system to divert calls from the

eight centers to other Bally centers not subject to the earn-out.  In reviewing a

dispute resolution clause in an earn-out provision similar to the Resolution Clause

here, the court in Fit Tech observed:

> [I]t makes no sense to assume that accountants would be entrusted
> with evaluating disputes about the operation of the business in
> question.  Yes, operational misconduct may well affect the level of
> earnings and therefore the schedules, but the misconduct itself would
> not be a breach of proper accounting standards.  Nor would one expect
> accountants to have special competence in deciding whether business
> misconduct unrelated to accounting conventions was a breach of
> contract or any implied duty of fair dealing.

Fit Tech, 374 F.3d at 8.  The Fit Tech court noted further that any dispute

regarding Defendants' operational conduct "involves not an accounting question

but contract interpretation and judgments about reasonable business practices." Id.

The court held the earn-out resolution procedures did not apply to claims involving

business misconduct affecting the earn-out.

Defendants try to distinguish Fit Tech by claiming that the accountant's role

in Fit Tech "was more tailored to the 'amount in dispute' and governed by the

parties' submissions", and that in this case the Resolution Clause does not

expressly define or limit the accountant's role.  Reply Brief in Support of

Defendants' Motion to Dismiss, p 8.  This argument is unpersuasive.  The facts in

this case are nearly identical to those in <u>Fit Tech</u>, and, while the Court is not bound

by <u>Fit Tech</u>'s ruling, the Court considers the First Circuit's analysis well-reasoned

and persuasive.[6]  The Court concludes the Resolution Clause does not apply to the

claim of contract and duty breach at issue here, rather it only applies to disputes

over objections to earn-out consideration calculations and not claims regarding

Defendants' software sales business conduct.

---

[6] There is a recent case in the Eleventh Circuit that deals with some of these same issues.  <u>See</u> <u>Senti v. Sanger Works Factory, Inc.</u>, 2007 WL 1174076 (M.D. Fla. 2007).  <u>Senti</u> also contained a similar earn-out provision and respective referral of any disputes regarding an earn-out to an independent accounting firm.  <u>Senti</u> is distinguishable because the referral to an accounting firm was optional, not mandatory.  More importantly, the asset purchase agreement in that case contained a separate arbitration clause for all disputes not relating to payments under the earn-out.  The court in <u>Senti</u>, citing <u>Fit Tech</u>, found that the two dispute resolution provisions were complementary and comprehensive.  Any calculation or computation dispute regarding the earn-out was referable to an independent accounting firm, while any dispute regarding alleged misconduct was referable to arbitration.  <u>Senti</u> confirms that an agreement may contain limited scope arbitration provisions dealing with disputes that may arise under the agreement.

B.   Plaintiffs' Claim for Breach of the Duty of Good Faith and Fair
     Dealing

Having found the Resolution Clause does not apply here, the Court

considers Defendants' motion to dismiss for breach of the duty of good faith and

fair dealing.  The standard for dismissal is clear: "While a complaint attacked by a

Rule 12(b)(6) motion to dismiss [for failure to state a claim upon which relief can

be granted] does not need detailed factual allegations, a plaintiff's obligation to

provide the grounds of his entitle[ment] to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not

do."  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007).  See also

Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002)

("conclusory allegations, unwarranted deductions of facts or legal conclusions

masquerading as facts will not prevent dismissal.").  In addressing a motion to

dismiss, the Court must "accept[] the factual allegations in the complaint as true

and constru[e] them in the light most favorable to the plaintiff."  Glover v. Liggett

Group, Inc., 459 F.3d 1304, 1308 (11th Cir. 2006).  "Dismissal is therefore

permitted when on the basis of a dispositive issue of law, no construction of the

factual allegations will support the cause of action."  Id. (internal citations omitted).

Pursuant to the choice of law provision in the APA, Delaware law governs in this matter.  Under Delaware law, an "implied covenant of good faith and fair dealing [is] engrafted upon every contract." PAMI-LEMB I Inc. v. EMB-NHC, L.L.C., 857 A.2d 998, 1015 (Del. Ch. 2004).  "That implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." Id. at 1016 (internal citations omitted).  It is well accepted that, "[t]he implied covenant is designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." Id. The implied covenant is applied by the Delaware courts "only in narrow circumstances" and cannot be used to either "forge a new agreement" (Chamison v. Health Trust, Inc., 735 A.2d 912, 921 (Del. Ch. 1999)) or "create a free-floating duty" (Dunlop v. State Farm Fire &Cas. Co., 878 A.2d 434, 441 (Del. 2005)). Cases implying the principles of good faith and fair dealing "should be rare and fact-intensive, turning on issues of compelling fairness." Cincinnati SMSA Ltd. P'ship v. Cincinatti Bell Cellular Systems, 708 A.2d 989, 992 (Del. 1998).  A party may invoke the covenant's protections when it is clear from the writing that the

contracting parties "would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." Katz v. Oak Industries, Inc., 508 A.2d 873, 880 (Del. Ch. 1986).

Though the APA does not impose express obligations on Defendants to promote Plaintiffs' products or expressly prohibit Defendants from diverting customers to Defendants' competing products, the APA contemplates additional compensation as specified in the Earn-Out. In O'Tool v. Genmar Holdings, Inc., the Tenth Circuit addressed a party's duty of good faith and fair dealing under Delaware law with respect to a contracted-for earn-out clause. 387 F.3d 1188 (10th Cir. 2004). The court explained:

> Defendants' arguments [that they are not in breach of the agreement], in our view, ignore the spirit of the parties' agreement. As noted, the agreement expressly stated the purchase price paid by defendants [Buyer] to Pepper/Horizon [Sellers] would be comprised of two components: (1) cash consideration upon closing; and (2) earn-out consideration, based upon GMK [a newly formed subsidiary of which the plaintiff Pepper would become president under the agreement] meeting or exceeding certain gross revenue goals, for five years following closing. The obvious spirit of this latter component was that Pepper, as president of GMK, *would be given a fair opportunity to operate the company in such a fashion as to maximize the earn-out consideration available under the agreement* (approximately $5.2 million dollars over five years).

Id. at 1196-97 (emphasis added).[7]

While the seller in O'Tool was promised an opportunity to operate the newly formed subsidiary under which his products were to be sold, where here Hodges was not promised an opportunity to operate MedAssets NRS or Med-Data, this difference does not discredit the usefulness of the O'Tool reasoning in this case. Plaintiffs in this case appear to have expected that there would be a fair opportunity to maximize the Earn-Out, and Plaintiffs argue that they would have contracted to prohibit Defendants from "immediately chang[ing] the brand by developing products not subject to an earn-out" had the parties contemplated that products not subject to the Earn-Out would supplant sales of the Earn-Out generating products. Memorandum in Opposition to Defendants' Motion to Dismiss, p 14.  Plaintiffs claim Defendants did just that–that they failed in their implied duty of good faith and fair dealing to operate the company in a manner providing Plaintiffs a reasonable opportunity to maximize the earn-out provision.

---

[7] While O'Tool is a Tenth Circuit opinion and thus not binding on this Court, O'Tool squarely addresses the parties' obligations and duties of good faith and fair dealing with respect to an earn-out provision.  The Court finds the reasoning in O'Tool persuasive.

Plaintiffs allege Defendants signed the APA with the full intention of "sun-setting" Plaintiffs' former products in order to supplant them with Defendants' comparable products, as well as converting Plaintiffs' contracts and intellectual property to products not subject to the earn-out.  Plaintiffs further allege that Defendants inhibited the sale and marketability of those products in an effort to subvert the earn-out.  Defendants respond that they had no obligation under the APA to sell or distribute the products in a manner of the Plaintiffs' choosing, and even if they did, Plaintiffs' software products were inferior and created problems that resulted in the termination of certain client contracts.  It appears clear to the Court that there are issues of fact to be addressed through discovery and resolved at a later date.[8]  This issue simply cannot be resolved as a matter of law.


C.    Claim Against MedAssets, Inc.

---

[8] Defendants also claim the merger clause of the APA defeats any claim for breach of the duty of good faith and fair dealing.  A valid merger clause under Delaware law precludes the consideration of extraneous agreements outside the four corners of the contract.  However, the implied covenant of good faith and fair dealing is inherent in all contracts under Delaware law, and a merger clause does not bar a claim based on violation of the implied covenant.  See Fitzgerald v. Cantor, 1998 WL 842316, *1 n.5 (Del. Ch. November 10, 1998).

Defendants move to dismiss MedAssets, Inc., contending that Plaintiffs fail to state any valid cause of action against MedAssets, Inc.  Defendants argue that MedAssets, Inc. was not a party to the APA and is not responsible for any obligations under the APA.  Defendants contend that Plaintiffs' claim of breach of duty is solely against MedAssets NRS.

Plaintiffs argue that at the time of the APA, Hodges personally entered into an employment agreement with MedAssets NRS, and contemporaneously executed an Option Grant Notice with Defendant MedAssets, Inc. which provided her with PASO Options.  That Hodges contemporaneously executed all three documents does not cause obligations under one agreement to be enforceable against the parties to another contemporaneously executed agreement.  Under Delaware law, while a contract may incorporate by reference provisions contained in some other instrument, "an agreement will not be deemed to incorporate matter in some other instrument or writing except to the extent that the same is specifically set forth or identified by reference."  Star States Development Co. v. CLK, Inc., 1994 WL 233954 *4 (Del. Super. 1994)[9], citing State v. Black, 83 A.2d 678 (Del. Super.

---

[9] Unreported decisions of the Delaware Supreme or lower courts may be cited as precedent.  See Delaware Supr. Ct. R. 14(b)(vi)(4).

1951).  Neither the APA nor the Employment Agreement were specifically incorporated or referenced by the Option Grant Notice.[10]  MedAssets, Inc. only was required to fulfill its obligations under the Option Grant Notice, namely to give Hodges 175,000 PASO Options which were to vest at the earlier of (1) the seventh anniversary of the July 15, 2005 option grant, or (2) June 30, 2007, if certain performance measures were met.[11]

Plaintiffs make the conclusory argument that MedAssets, Inc. is a proper party in this case both as issuer of the PASO Options "and for controlling MedAssets NRS in the wrongful acts alleged in the Complaint."  Memorandum in Opposition to Defendants' Motion to Dismiss, p 16.  Plaintiffs do not offer any

---

[10] Section 11.6 of the APA does state, "The Parent [MedAssets, Inc.] shall have executed and delivered to the individuals set forth on Schedule 11.6 hereto an option agreement for the applicable number of shares set forth on Schedule 11.6 hereto and substantially in the form of Exhibit B hereto (or in the case of the Shareholder, Exhibit B-1 hereto)."  However, there is no indication that the Option Grant Notice specifically incorporated the APA, nor does this section alone, which references solely the options delivery obligations by the Parent, confer the full obligations of the APA onto MedAssets, Inc.

[11] Plaintiffs' argument that the PASO Options vested at nearly the same EBITDA as the earn-out does not satisfy the specific incorporation or reference as required by Delaware law.  Though similar formulas may have been used to calculate both the maximum earn-out determination and the vesting of Hodges' PASO Options, that fact alone cannot impose any obligation or duty on MedAssets, Inc.

factual or legal support for this contention.  In the absence of any sustainable claim against MedAssets, Inc., it is required to be dismissed.[12]

D.    Punitive Damages

Finally, the Court turns to Plaintiffs' claim for punitive damages.  It is well settled under Delaware law that punitive damages are not available under a contract claim, unless the conduct also independently supports a claim of tort.  <u>E.I. DuPont de Nemours & Co. v. Pressman</u>, 679 A.2d 436, 445 (Del. 1996) (citing Restatement (Second) of Contracts § 347 (1979)).  "[M]ere bad faith on the part of a party to a contract will not give rise to punitive damages." <u>Id</u>.  The defendant's conduct must rise to the level of "a willful wrong, in the nature of deceit." <u>Gillenardo v. Connor Broadcasting Delaware Co.</u>, 2002 WL 991110, *11 (Del. Super. 2002).  While the bases for punitive damages claim appears doubtful, Plaintiffs' discovery of Defendants' conduct has not yet been conducted, and this is not the stage of the case to formally decide whether a claim for punitive damages is viable.

---

[12] Though according to the APA MedAssets NRS (as the successor to Project Metro) is a wholly owned subsidiary of MedAssets, Inc., that fact alone does not establish any agency relationship between parent and subsidiary, nor is one even alleged by Plaintiffs.  <u>See</u> <u>Eisenmann Corp. v. General Motors Corp.</u>, 2000 WL 140781 *12 n.10 (Del. Super. 2000).

### III.   CONCLUSION

For the foregoing reasons,

Defendants' Motion to Dismiss or, In the Alternative, Stay Judicial

Proceedings Pending Alternative Dispute Resolution [5] is **DENIED IN PART**

**AND GRANTED IN PART.**

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss for failure

to state a claim is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Stay Judicial

Proceedings Pending Alternative Dispute Resolution is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss

MedAssets, Inc. as a Defendant is **GRANTED**.

**SO ORDERED** this 19th day of February, 2008.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE